IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION



SOUTHERN COAL CORPORATION,

     Plaintiff,

     v.

IEG PTY, LTD,                      CIVIL NO. 2:14cv617

INTERMARINE, LLC,

     and

BBC CHARTERING & LOGISTIC
GMBH & CO. KG,

     Defendants.

## OPINION AND ORDER

Southern Coal Corporation ("Southern" or "Plaintiff"), filed this suit against IEG PTY,

LTD ("IEG"), Intermarine, LLC ("Intermarine"), and BBC Chartering & Logistic Gmbh & Co.

KG ("BBC Chartering"), which arose from a contract between Southern and IEG to arrange for

the transportation of Southern's mining equipment from Australia to Virginia. In response, IEG

filed a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6). ECF No. 67. On

March 16, 2015, the Court held a hearing at which counsel for Southern and IEG appeared

before the Court and argued their respective positions. At the hearing, the Court **DENIED** IEG's

Motion to Dismiss without prejudice and now memorializes its reasons herein.

## I.    FACTUAL BACKGROUND

The following summary is taken from factual allegations contained in Plaintiff's

Amended Complaint, which, for purposes of ruling on the instant Motion to Dismiss, the Court

accepts as true.[1]

Southern is a coal mining company located in Virginia and West Virginia. Am. Compl. ¶ 8, ECF 65. In 2011, it purchased two large P&H Mk II 2800 mining shovels ("Shovels"), which at that time were located in Australia, for several million dollars each. Id. ¶¶ 9–10. As Southern's operations were based in Virginia, Southern needed to ship these Shovels to the United States for use in its mines. Id. ¶¶ 11–12. As a result, Southern, through its disclosed agent in Australia, AAMAC Industries, Pty. Ltd. ("AAMAC"), contracted with IEG, an Australian-based logistics company, to arrange for the ocean shipping of Southern's Shovels from Newcastle, Australia to Norfolk, Virginia. Id. ¶¶ 13–15.

This contract contained explicit terms regarding the delivery of the Shovels. Through AAMAC, Southern advised IEG that a material term of the contract was that "time was of the essence" and that Southern needed the Shovels in Virginia as soon as possible. Id. ¶¶ 18, 64. Additionally, through AAMAC and SENRAC, Southern's other disclosed agent, Southern advised IEG that another material term was that the Shovels be protected from the weather during their ocean shipment to Virginia. Id. ¶¶ 19–20, 63. Consequently, IEG was directed to ensure that the Shovels be carried below deck during transportation from Australia to Virginia. Id. ¶ 20. In exchange, Southern was to pay IEG $1,110,752.71 in freight costs—a figure based on the Shovels being carried below deck and being shipped directly from Australia to Virginia in a timely fashion. Id. ¶ 28.

After entering the contract, both parties prepared for the transportation of the Shovels. IEG chartered space aboard the BBC RIO GRANDE ("RIO GRANDE") in order to ship the Shovels from Newcastle, Australia to Norfolk, Virginia in early November 2011. Id. ¶¶ 26–27.

---

[1] In ruling on a motion to dismiss, the court must accept the plaintiff's factual allegations as true. See Burnette v. Fahey, 687 F.3d 171, 180 (4th Cir. 2012).

These shipping arrangements "contemplated the Shovels being carried below deck." Id. ¶ 27. At the time, the RIO GRANDE was owned and operated by BBC Chartering. Id. ¶ 22. However, in the fall of 2011, when these events were taking place, BBC Chartering had chartered the RIO GRANDE to Scan Trans Holding ("Scan Trans"). Id. ¶ 23. Southern refurbished the Shovels in order to ready them for immediate use upon delivery in Virginia. Id. ¶ 16. When Southern delivered the Shovels to the RIO GRANDE in early October 2011, the Shovels were in "good order." Id. ¶ 30. Furthermore, a bill of lading[2] was issued for the voyage. Id. ¶¶ 32–33; Ex. 1. At the time of the Vessel's departure on or about October 12, 2011, Southern understood that the RIO GRANDE's voyage would proceed directly to the United States via the Panama Canal, with a planned arrival in Norfolk, Virginia on or about November 5, 2011. Id. ¶ 36.

However, the voyage did not go as Southern planned. Although the Shovels were supposed to be stored below deck, parts of the Shovels were carried on deck and exposed to the full force of the seas and weather. Id. ¶ 35. Furthermore, by early November 2011, the RIO GRANDE had deviated from her intended voyage, diverting to Masan, Republic of Korea ("Korea"). Id. ¶ 37. Upon arrival, the Shovels were placed ashore, fully exposed to the weather. Id. ¶¶ 37, 46. However, IEG did not notify Southern about the RIO GRANDE's diversion and the Shovels arrival in Masan, Korea until December 2011. Id. ¶ 40. Prior to this notification, Southern had no indication that the Shovels would be diverted to Korea and placed ashore. Id. ¶ 41. Furthermore, neither Southern nor its any of its agents, authorized such a diversion. Id. ¶¶ 42–45.

---

[2] "A bill of lading is a '[d]ocument evidencing receipt of goods for shipment issued by person engaged in business of transporting or forwarding goods . . . .'" Duck Head Footwear v. Mason & Dixon Lines, Inc., 41 Fed. App'x 692, 694 n.3 (4th Cir. 2002) (quoting Black's Law Dictionary 168 (6th ed. 1990)). "It is further defined as '[a]n instrument in writing, signed by a carrier or his agent, describing the freight so as to identify it, stating the name of the consignor, the terms of the contract for carriage, and agreeing or directing that the freight be delivered to the order or assigns of a specified person at a specified place.'" Id. (quoting Black's Law Dictionary 168 (6th ed. 1990)).

After several weeks ashore, on December 6, 2011, the Shovels were loaded aboard the MV CLIPPER NEW HAVEN (the "NEW HAVEN") for transport to the United States. Id. ¶¶ 46–47. A separate bill of lading was issued for the journey from Korea to Virginia identifying BBC Chartering as the carrier for that voyage. Id. ¶ 48; Ex. 2. Again, however, contrary to the agreement between IEG and Southern, the Shovels were transported above deck and not adequately tarped or otherwise protected from the elements. Id. ¶¶ 49–50. On or about December 10, 2011, the NEW HAVEN stopped at a port in Japan. Id. ¶ 51. On or about January 13, 2012, the NEW HAVEN finally arrived in Hampton Roads, Virginia and landed the Shovels the following day. Id. ¶¶ 52–53. Upon their arrival onshore, however, Southern found that exposure to the weather and seawater had badly damaged the Shovels. Id. ¶ 54.

On January 21, 2014, Southern brought a suit in the Western District of Virginia against IEG, SENRAC, and GDL Enterprises ("GDL").[3] After both GDL and SENRAC each filed a Motion to Dismiss, ECF Nos. 15, 18, Southern voluntarily dismissed its action against those parties, ECF Nos. 51, 53. Subsequently, on December 4, 2014, the Western District of Virginia granted Southern's Unopposed Motion to Transfer Venue, ECF No. 54, and transferred the case to the United States District Court for the Eastern District of Virginia. ECF No. 57. On December 30, 2014, Southern filed an Amended Complaint, bringing claims of breach of freight and carriage contract as well as fiduciary duties against IEG, BBC Chartering, and Scan Trans' corporate successor, Intermarine.[4] ECF No. 65. On January 19, 2015, IEG filed a Motion to Dismiss, which is presently before the Court. ECF No. 67.

---

[3] In its original Complaint, Southern alleged that GDL acted as Southern's agent in the contract with IEG. Compl. ¶ 17, ECF No. 1.
[4] According to the Amended Complaint, Scan Trans merged into Intermarine, LLC in August 2012. Am. Compl. ¶ 25, ECF No. 65.

## II.    MOTION TO DISMISS

In its Amended Complaint, Southern brings five different claims. In Count I, Southern brings a claim for breach of freight forwarding contract against IEG. Count II, which is pled in the alternative to Count I, brings an action for a breach of contract of carriage against IEG. In Count III, which is also pled in the alternative to Counts I and II, Southern brings a breach of fiduciary duty claim against IEG. The additional two Counts are brought against other defendants and are thus immaterial to the present inquiry.[5]

In response, IEG moves to dismiss Southern's claims on five grounds. First, IEG argues that the Court lacks *in personam* jurisdiction over it. Second, IEG claims that the Court has no subject matter jurisdiction over the alleged contractual terms. Third, IEG asserts that the dispute should not be brought in the Eastern District of Virginia because the dispute arises under a Booking Note contract that calls for any litigation to be brought in the District Court of Amsterdam. Fourth, IEG argues that the applicable Booking Note also incorporates the Carriage of Goods by Sea Act, which carries a one-year statute of limitations that has already run. Finally, IEG claims that even if the Court has jurisdiction and the action is not barred, Southern has not stated a claim for which relief can be granted.

As courts generally resolve questions of jurisdiction before proceeding to the merits of a claim, the Court first considers the jurisdictional issues. Long Term Care Partners, LLC v. United States, 516 F.3d 225, 240 (4th Cir. 2008) ("[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject matter jurisdiction) and the parties (personal jurisdiction).").

---

[5] Count IV, which is pled in the alternative to Count II, is a claim for breach of contract of carriage against Intermarine. Count V, which is also pled in the alternative to Counts II and IV, is an action for breach of contract of carriage against BBC Chartering.

A.    **Personal Jurisdiction**

1.    **Standard of Review**

"When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff ultimately bears the burden of proving to the district court judge the existence of jurisdiction over the defendant by a preponderance of the evidence." New Wellington Fin. Corp. v. Flagship Resort Dev. Corp., 416 F.3d 290, 294 (4th Cir. 2005). "[W]hen, as here, the court addresses the question on the basis only of motion papers, supporting legal memoranda and the relevant allegations of a complaint, the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis to survive the jurisdictional challenge." Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989). Furthermore, "the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." Id.

"A lawful assertion of personal jurisdiction over a defendant requires satisfying the standards of the forum state's long-arm statute and respecting the safeguards enshrined in the Fourteenth Amendment's Due Process Clause." Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co., Ltd., 682 F.3d 292, 301 (4th Cir. 2012). "To establish personal jurisdiction over a nonresident defendant through a state long arm statute, a court must first determine that jurisdiction is authorized by state law." Mitrano v. Hawes, 377 F.3d 402 (4th Cir. 2004). Under the relevant portions of the Virginia long-arm statute, "[a] court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's: . . . [t]ransacting any business in this Commonwealth." VA. CODE § 8.01-328.1(A)(2). "The Virginia Supreme Court has characterized this statute as a 'single transaction' test that asserts personal jurisdiction to the extent permissible under the Due Process Clause." Promotions, Ltd. v. Brooklyn Bridge Centennial Comm., 763 F.2d 173, 175 (4th Cir. 1985) (per

curiam). "Because Virginia's long-arm statute is intended to extend personal jurisdiction to the extent permissible under the due process clause, the statutory inquiry merges with the constitutional inquiry." Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 277 (4th Cir. 2009).

Therefore, the plaintiff must satisfy the relevant constitutional restrictions. "The Due Process Clause of the Fourteenth Amendment sets the outer boundaries of a state tribunal's authority to proceed against a defendant." Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S. Ct. 2846, 2853 (2011). As applied to *in personam* jurisdiction, the Due Process Clause prohibits an individual from being hauled into court and bound by judgments in a state with which he has no significant "contacts, ties, or relations." Int'l Shoe Co. v. Washington, 326 U.S. 310, 319, 66 S. Ct. 154, 160 (1945). As a result a court is permitted to exercise personal jurisdiction over a defendant only if that defendant has sufficient "minimum contacts" with the forum state such that bringing the suit would not offend "traditional notions of fair play and substantial justice." Id. at 316, 66 S. Ct. at 154 (quoting Milliken v. Meyer, 311 U.S. 457, 463, 61 S. Ct. 339, 343 (1940)); see Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471–78, 105 S. Ct. 2174, 2181–85 (1985); World–Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291–94, 100 S. Ct. 559, 564–66 (1980). "'[A] single act by a defendant can be sufficient to satisfy the necessary 'quality and nature' of such minimal contacts, although 'casual' or 'isolated' contacts are insufficient to trigger' an obligation to litigate in the forum." Tire Eng'g & Distribution, 682 F.3d at 301 (quoting CFA Institute v. Institute of Chartered Financial Analysts of India, 551 F.3d 285, 293 (4th Cir. 2009)).

"Under the Fourteenth Amendment's Due Process Clause, there are two paths permitting a court to assert personal jurisdiction over a nonresident defendant." Universal Leather, LLC v.

Koro AR, S.A., 773 F.3d 553, 559 (4th Cir. 2014). "The first path is 'specific jurisdiction,' which may be established if the defendant's qualifying contacts with the forum state also constitute the basis for the suit." Id. (quoting Tire Eng'g & Distribution, 682 F.3d at 301). "The second path is 'general jurisdiction,' which requires a 'more demanding showing of continuous and systematic activities in the forum state.'" Id. (quoting Tire Eng'g & Distribution, 682 F.3d at 301). Because the parties confined their arguments to specific jurisdiction, and no other jurisdictional grounds were seriously entertained by either party, the Court will confine its inquiry to this type of jurisdiction. The Fourth Circuit has synthesized the due process requirements for establishing specific personal jurisdiction into a three-part test, in which it considers

> (1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable.

Consulting Eng'rs Corp., 561 F.3d at 278 (quoting ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 712 (4th Cir. 2002)).

## 2.    Analysis

IEG first challenges the Court's personal jurisdiction on the grounds that IEG did not have sufficient contact with Virginia to allow the Court to exercise jurisdiction over it. IEG asserts that it only agreed to "arrange for the ocean shipping of the Shovels from Newcastle, Australia to Norfolk, Virginia." Memo. in Supp. of Mot. to Dismiss at 2, ECF No. 68 (quoting Am. Compl. ¶ 14, ECF No. 65). IEG claims that throughout the transaction, none of its representatives ever negotiated, visited, or performed any contractual duties in Virginia. Furthermore, IEG maintains it never performed any of its obligations under the contract in

Virginia. To support this contention, IEG cites <u>Prima U.S. Inc. v. Panalpina, Inc.</u>, 223 F.3d 126 (2d Cir. 2000), which stated the general duties of a freight forwarder as "secur[ing] cargo space with a steamship company, giv[ing] advice on governmental licensing requirements, proper port of exit and letter of credit intricacies, and arrang[ing] to have the cargo reach the seaboard in time to meet the designated vessel." 223 F.3d at 129. (quoting <u>N.Y. Foreign Freight Forwarders & Brokers Ass'n v. Fed. Maritime Comm'n</u>, 337 F.2d 289, 292 (2d Cir. 1964)). Based on this definition, IEG contends that it performed all its obligations under the contract once it arranged for the transportation of the Shovels. As a result, IEG concludes that its complete absence of any connection with Virginia renders the exercise of personal jurisdiction improper.

The Fourth Circuit has yet to rule on whether a freight forwarder, or similar international shipping entity, avails itself to a jurisdiction when it arranges to ship goods to the jurisdiction. Furthermore, neither party identifies a case in which a court has explicitly considered such a question. However, in construing all allegations in favor of Southern and drawing the most favorable inferences for jurisdiction, the Court concludes that Southern has sufficiently made a prima facie showing of *in personam* jurisdiction over IEG.

### a.      Purposeful Availment

At the outset, the first prong of the Fourth Circuit's test—the extent to which the defendant purposefully availed itself to the forum state—favors a finding of personal jurisdiction. This element obliges the Court to inquire whether "a corporation that enjoys the privilege of conducting business within a state bears the reciprocal obligation of answering to legal proceedings there." <u>Universal Leather, LLC</u>, 773 F.3d at 559 (quoting <u>Tire Eng'g & Distribution</u>, 682 F.3d at 301 (internal quotation marks omitted)). Furthermore, the test "flexible" and analysis is done "on a case-by-case basis." <u>Tire Eng'g & Distribution</u>, 682 F.3d at 302.

In the present case, IEG's communications with Southern, continued performance, actions in Virginia, and post-contract actions combined indicate it purposefully availed itself to Virginia. To begin with, IEG's interactions with Southern throughout the negotiation and performance of the contract favor a finding purposeful availment. Courts have considered correspondence or communications with an entity located in the forum state to support a finding of jurisdiction. See Rambo v. American S. Ins. Co., 839 F.2d 1415, 1418 (10th Cir. 1988) ("[T]elephone calls and letters may provide sufficient contacts for the exercise of personal jurisdiction."). Although the Amended Complaint implies that Southern's Australia-based agents negotiated part of the transaction, an exhibit attached to Southern's Opposition[6] indicates IEG sent Southern an email finalizing their agreement. Pl.'s Opposition to Mot. to Dismiss, Ex. 1 (hereinafter "Tolley Aff."), ECF No. 72, Ex. 1. Furthermore, throughout the transaction, IEG sent tax invoices directly to Southern's address in Virginia. Tolley Aff. Ex. 2. After the contract was entered, IEG continued to maintain contact with Southern regarding the problems that arose during the transportation of the Shovels. Tolley Aff. Ex. 5. This continued communication and correspondence with the Virginia-based Southern through email and letters (the bills) weighs in favor of purposeful availment.

Furthermore, IEG's performance in Virginia provides further support for jurisdiction. The place of contract performance has been found relevant to the purposeful availment analysis. Raymond, Colesar, Glaspy & Huss, P.C. v. Allied Capital Corp., 761 F. Supp. 423, 426 (E.D. Va. 1991) (Spencer, J.); see also English & Smith v. Metzger, 901 F.2d 36, 39 (4th Cir. 1990); Nan Ya Plastics Corp. U.S.A. v. DeSantis, 237 Va. 255, 260, 377 S.E.2d 388, 391 (1989). IEG

---

[6] Although these attachments were not mentioned in the Amended Complaint and will not be considered for the sake of deciding other challenges to the sufficiency of the Amended Complaint, the Court may consider the "motion papers" and "other supporting legal memoranda" for the purpose of deciding the personal jurisdiction issues. See Combs, 886 F.2d at 676.

maintains that its role in the contract simply extended to that of a travel agent; it merely had to book transportation for the Shovels to Virginia. However, this characterization is irreconcilable with certain events that took place after the RIO GRANDE left Australia. IEG's account fails to explain IEG's efforts in Korea. IEG worked closely with Southern to resolve all problems regarding the Shovels deviation to Korea—a month after IEG maintains it performed all of its obligations under the contract. See Tolley Aff. Ex. 5. Consequently, IEG would have performed part of the contract upon its arrival and presence in Virginia. This fact again cuts in favor of purposeful availment.

IEG's actions after the Shovels arrived at Norfolk, Virginia also supports jurisdiction. Through emails attached to its Opposition, Southern has established that once the Shovels arrived at Norfolk, Virginia, IEG refused to release the Shovels to Southern until Southern paid IEG for the shipment. Tolley Aff. Ex. 6–7. As a result, the Shovels sat in port from January 2012 until around March 2012. Id. Ex. 7 (noting that as of March 4, 2012, IEG had not received payment and the shipment could not be released). During this period, IEG was legally responsible for the Shovels.[7] As a result, IEG enjoyed the benefits and protections of Virginia law for almost three months to enforce its claim over the Shovels. Furthermore, during this period, agents must have been carrying out IEG's directions to not release the Shovels on IEG's behalf. Therefore, although IEG's direct representatives never physically visited Virginia, IEG operated in Virginia through its agents in the state. Such activity obviously promotes the case for jurisdiction.

IEG's actions post-contract further back a finding of purposeful availment. In considering whether a business has engaged in such activity, courts should consider "whether the defendant

---

[7] The fact that the bills of lading, which "represent title to cargo", Triodetic Inc. v. Statue of Liberty IV, LLC, 2013 WL 6017926 (S.D. N.Y. 2013 Nov. 6, 2013), listed IEG as the shipper indicates that it had title to the Shovels. IEG's actions, in refusing to release the Shovels, corroborate such legal control.

11

reached into the forum state to solicit or initiate business." Consulting Eng'rs Corp., 561 F.3d at 278. In the present case, instead of avoiding Virginia post-contract, IEG has advertised its performance of the Southern contract to Virginia on its website. Tolley Aff. Ex. 4. This fact indicates that IEG is attempting to solicit more business from similar Virginia clients, which also favors a finding of jurisdiction.

As a result of its interactions with Southern as well as its performance and actions in Virginia, IEG should have anticipated being haled into Virginia courts. IEG could have avoided such a result by refusing any contract that organized transportation to Virginia or sending the shipment to an adjacent state or location. At the very least, IEG could have avoided Virginia post-contract. Therefore, in light of IEG's communications with Southern, performance, actions in Norfolk, and post-contract advertisement, the Court found, and so finds today, that IEG purposefully availed itself to Virginia.

### b.    Arising from Activities Directed at Virginia

IEG's actions also satisfy the second prong of the Fourth Circuit test—that plaintiff's claims arise out of those activities directed at the forum state. A plaintiff's claims "arise out of activities directed at the forum state if substantial correspondence and collaboration between the parties, one of which is based in the forum state, forms an important part of the claim." Tire Eng'g & Distribution, 682 F.3d at 303. Here, the corroboration between Southern, a Virginia company, and IEG underlay the entire transaction. As mentioned earlier, a substantial amount of correspondence and collaboration occurred between IEG and Southern to negotiate, enter, and perform the contract. Furthermore, the contract itself was directed at Virginia. IEG entered the contract with the explicit purpose of sending the Shovels to Virginia. The bills of lading that control this transaction, along with the bills later sent directly from IEG to Southern, explicitly

12

stated the "port of discharge" as Norfolk, Virginia. As a result, from the very beginning of the transaction, IEG knew it had to arrange shipping to Virginia. Therefore, the Court can assume that the nature of the underlying contract was directed at Virginia.

### c.    Constitutional Reasonability

Finally, IEG's actions satisfy the third element of the Fourth Circuit test, as the exercise of personal jurisdiction would be constitutionally reasonable. "This prong of the analysis 'ensures that litigation is not so gravely difficult and inconvenient as to place the defendant at a severe disadvantage in comparison to his opponent.'" Tire Eng'g & Distribution, 682 F.3d at 303 (quoting CFA Institute, 551 F.3d at 296). The Court must consider "[t]he burden on the defendant, interests of the forum state, and the plaintiff's interest in obtaining relief." Id. Although the Court acknowledges some burden to IEG, which must interact internationally with a local attorney, the interests of the forum state and the plaintiff's interest weight heavily in favor of jurisdiction. "Virginia has a valid interest in the resolution of the grievances of its citizens and businesses" CFA Institute, 551 F.3d at 297. Furthermore, Southern has an obviously strong interest in obtaining relief for damage to its Shovels. These factors tip the scales in favor of Southern. As a result, the Court found, and so finds today, its exercise of jurisdiction over IEG would be constitutionally reasonable.

For these reasons, the Court **FOUND, AND SO FINDS TODAY**, that Southern has sufficiently made the necessary preliminary showing for the Court to exercise personal jurisdiction over IEG at the pleading stage.[8] Accordingly, the Court **DENIED** IEG's challenge to personal jurisdiction without prejudice.

---

[8] Note, however, that "[a] threshold *prima facie* finding that personal jurisdiction is proper does not finally settle the issue; plaintiff must eventually prove the existence of personal jurisdiction by a preponderance of the evidence, either at trial or at a pretrial evidentiary hearing." Prod. Grp. Int'l v. Goldman, 337 F. Supp. 2d 788, 793 n.2 (E.D.Va.2004) (Ellis, J.).

13

### B.    Subject Matter Jurisdiction

IEG also challenges whether the Court has subject matter jurisdiction over the present case. In its Amended Complaint, Southern alleges maritime jurisdiction, and alternatively, diversity jurisdiction. IEG's Motion to Dismiss, however, takes issue only with Southern's maritime jurisdiction.

### 1.    Standard of Review

"The boundaries of admiralty jurisdiction over contracts—as opposed to torts or crimes—being conceptual rather than spatial, have always been difficult to draw." Kossick v. United Fruit Co., 365 U.S. 731, 735, 81 S. Ct. 886, 890 (1961). "[C]ourts have always looked to the subject matter of the contract to determine whether admiralty jurisdiction attaches." McCorkle v. First Penn. Banking & Trust Co., 459 F.2d 243, 246–47 (4th Cir. 1972). "If the contract's subject matter is 'maritime in nature,' there is jurisdiction." Id. at 247 (citing N. Pacific S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co., 249 U.S. 119, 126–27 (1919)). "A long-recognized principle for determining whether a contract is maritime is that agreements preliminary to maritime contracts are not cognizable in admiralty." Ingersoll Mill. Mach. Co. v. M/V Bodena, 829 F.2d 293, 301 (2d Cir. 1987).

### 2.    Analysis

Although neither the Fourth Circuit, nor any of its lower courts, has yet to explicitly consider whether freight forwarding contracts fall within the ambit of maritime jurisdiction, other courts have split over whether freight forwarding contracts constitute "preliminary" agreements. Id. at 302. In Johnson Products Co., Inc. v. M/V La Molinera, 619 F. Supp. 764 (S.D.N.Y. 1985), a federal district court found that a freight forwarding contract constituted a preliminary agreement when the only obligations of the freight forwarder were to obtain quotes from overseas carriers and pass along the bill of lading issued by the carrier. Id. at 766–67. On

the other hand, in Ingersoll, the Second Circuit found that the freight forwarder's duty to "secure clean bills of lading" and "review the copies it received and advise [the shipper] if in fact they were not clean" was "an essential and integral part of the shipping process" that rendered the contract "squarely within the admiralty jurisdiction of the federal courts." Id. at 302–03.

Applying these principles to the present case, the contract between IEG and Southern, as alleged, constitutes a maritime contract. Although no written contract was attached to the Amended Complaint, Southern alleges IEG's obligations under the agreement. One of the alleged obligations, which the Court must accept as true at this stage in the proceedings, states that IEG had the duty to arrange for the shipping of the Shovels to Norfolk, Virginia. This obligation implies that IEG was responsible for preparing or securing the bill of lading. This duty to obtain the bill of lading is much more substantial than the duty of the freight forwarder in Johnson Products, who simply passed along the bill of lading. In fact, IEG's duty to prepare the bill of lading is identical to obligations of the freight forwarder in Ingersoll. The strong resemblance between Ingersoll and the case at bar indicate that the contract between Southern and IEG was not a preliminary agreement.

An exhibit to the Amended Complaint provides further support for this conclusion. Attached to the Amended Complaint were two bills of lading. In addition to the first bill of lading, which was supposed to control the trip from Australia to Virginia, another bill of lading was attached for the voyage from Masan, Korea to Norfolk, Virginia. Am. Compl. Exs. 1–2, ECF No. 65. This second bill of lading indicates that the contract contemplated IEG's role continuing after the loading of the Shovels in Australia. This document shows that the contract between Southern and IEG was not a preliminary contract but was essential to the maritime voyage.

15

For these reasons, the Court **FOUND, AND SO FINDS TODAY**, that the contract was maritime in nature and that maritime jurisdiction is valid.

### C.   The Forum Selection Clause & Statute of Limitations (The Booking Note)

IEG also challenges the Amended Complaint on the grounds that the Eastern District of Virginia is the incorrect forum for this litigation and the statute of limitations bars this case. As both of these arguments are premised on the validity of a Booking Note contract attached to the Motion to Dismiss, the Court considers the merits together.

IEG argues that the contract that governed the transaction was a Booking Note dated August 8, 2011. It points out that this document contained a forum selection clause, which states that "any dispute or action under this Booking-Note shall be decided by the District Court of Amsterdam, the Netherlands, to the exclusive jurisdiction of which the Carrier and the Merchant submit themselves." Dec. of Zoran Nastevski Ex. 3 ¶ 32, ECF No. 69. IEG notes that the clause also states that "[t]his Booking-Note shall be governed by and construed in accordance with the laws of the Netherlands . . . and *for US Trade the US COGSA shall apply* . . . ." Id. (emphasis added). IEG reasons that if the COGSA ("Carriage of Goods by Sea Act") applies, the one year statute of limitations incorporated in the act, which runs from the delivery of the goods at issue, should apply. 46 U.S.C. App. § 30701(6) ("[T]he carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered.").[9] IEG maintains that since the cargo was delivered around January 2012 and this suit was not filed until January 2014, the one year statute of limitations has run. Under this language, IEG concludes that the present action should not only be brought in the Netherlands but is barred from being brought in the

---

[9] Previously codified at 46 U.S.C. App. § 1301.

United States.

However, IEG's argument does not stand up to scrutiny. Although the Court must take the allegations pled in the Complaint as true, the Court may also consider documents attached to the motion to dismiss as long as they are authentic and integral to and explicitly relied upon in the complaint. Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009); Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 234 (4th Cir. 2004). It is clear that the contract governing the transaction would be integral to the Amended Complaint. Furthermore, as Southern brought breach of contract claims, such a contract was explicitly relied upon in its Amended Complaint. However, as pointed out by Southern, there are some real questions regarding the authenticity of the Booking Note. First, several physical characteristics of the document itself raise some eyebrows. Southern correctly points out that the document seems to be a combination of two different documents. This conclusion is supported by a couple of redundancies in the document. Clauses 19 to 26 are repeated, are in different fonts, and cover completely different subjects. Although the front page of the Booking Note states that "[a]dditional clauses numbered 19 to 26 to be fully incorporated this [*sic*] booking note," the Note does not specify which clauses are supposed to replace the other.

Second, Southern also correctly identifies evidence that another Booking Note controls. Southern points out that the second bill of lading states "FREIGHT PAYABLE AS PER BN DD 10.11.11." Assuming BN stands for Booking Note, the language indicates another Booking Note dated November 10, 2011 controls the transaction. This fact cuts against the Booking Note presented by IEG as the governing contract. With the document possessing questionable physical characteristics and evidence of the existence of another Booking Note, the Court cannot accept the authenticity of IEG's Booking Note at this time. Accordingly, for the purposes of deciding

17

the Motion to Dismiss, the Court rejects IEG's arguments with respect to the Booking Note.

For these reasons, the Court **DENIED** IEG's challenges as to the proper forum and statute of limitations without prejudice.

### D.   Failure to State a Claim

#### 1.   Standard of Review

Finally, IEG asserts that Southern has failed to state a claim for which relief can be granted. Federal Rule of Civil Procedure 8(a)(2) mandates that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). The function of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint. The Fourth Circuit has held that a motion to dismiss under Rule 12(b)(6) should be granted only in "very limited circumstances." Rogers v. Jefferson–Pilot Life Ins. Co., 883 F.2d 324, 325 (4th Cir. 1989). However, dismissal is appropriate if it appears that the plaintiff is not "entitled to relief under any legal theory which might plausibly be suggested by the facts alleged." Harrison v. U.S. Postal Serv., 840 F.2d 1149, 1152 (4th Cir. 1988) (citation omitted); Davis v. Hudeins, 896 F. Supp. 561, 566 (E.D. Va. 1995) (Smith, J.). When reviewing the legal sufficiency of a complaint, the Court must accept "all well-pleaded allegations in the plaintiff's complaint as true" and draw "all reasonable factual inferences from those facts in the plaintiff's favor." Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999). Legal conclusions, on the other hand, are not entitled to the assumption of truth if they are not supported by factual allegations. Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).

#### 2.   Analysis

IEG contends that both of Southern's breach of contract claims should be dismissed. First, IEG asserts that Count I, breach of freight forwarding contract, should be dismissed because IEG never had any contractual obligations beyond delivering the cargo to the carrier.

Second, IEG argues that Count II, a claim for breach of contract of carriage, should be dismissed because IEG was never the carrier.

However, Southern sufficiently alleges claims for which relief can be granted. "Basic principles in the common law of contracts readily apply in the maritime context." Clevo Co. v. Hecny Transp., Inc., 715 F.3d 1189, 194 (9th Cir. 2013). Thus, under admiralty law, the elements of a breach of contract claim mirror that of a common law claim: (1) existence of a valid contract duty; (2) a material breach of contractual terms; and (3) damages resulting from that breach. Sweet Pea Marine, Ltd. v. APJ Marine, Inc., 411 F.3d 1242, 1249 (11th Cir. 2005); see Princess Cruises, Inc. v. General Elec. Co., 143 F.3d 828, 832 (4th Cir. 1998).

IEG's first argument lacks merit. As mentioned before, the second bill of lading attached to the Complaint contradicts IEG's characterization of its role as a 'travel agent' under the contract. Simply because Southern identified IEG as a freight forwarder in Count I does not limit IEG's obligations under the contract to that of a typical freight forwarder. Southern was free to enter into an agreement under which IEG had additional contractual obligations to Southern. That is the underlying principle of the freedom of contract under maritime law. See Berge Helene Ltd. v. GE Oil & Gas, Inc., 896 F.Supp.2d 582, 599 (S.D. Tex. 2012) ("[M]aritime law is designed to protect freedom of contract."). Southern alleges that IEG owed Southern additional obligations beyond that of a standard freight forwarder. Thus, in Count I, Southern has sufficiently pled a valid claim.

IEG's second argument also fails. In Count II, Southern alleges that even if IEG were not a freight forwarder, it violated its breach of contract as a carrier. IEG points out that the bill of lading for the trip from Korea to Virginia lists another party, BBC Chartering, as the carrier. Am. Comp. Ex. 2, ECF No. 65. IEG also notes that the other bill of lading, which governs the first leg

19

of the transaction, lists IEG as the shipper. Id. Ex. 1.

However, as Count II is pled in the alternative to Count I, Southern has pled enough facts to establish a breach of contract of carriage contract. Southern's allegations clearly establish that IEG was heavily involved in the transaction. IEG fails to note that the initial bill of lading left the carrier entry blank. Therefore, even if IEG were not the freight forwarder, it was definitely involved in the transaction. The only other involved party would be the carrier. In such a case, it is entirely plausible that Southern was the carrier, at least for the initial voyage from Australia. In light of these facts, the Court concludes that Southern has pled enough facts in Count II of its Amended Complaint.

For these reasons, the Court, **FOUND, AND SO FINDS TODAY**, that Southern has sufficiently alleged plausible claims against IEG under which relief can be granted.

III.    **CONCLUSION**

For the foregoing reasons, the Court **DENIED** IEG's Motion to Dismiss without prejudice.

The Clerk is **DIRECTED** to forward a copy of this Order to all Counsel of Record.

**IT IS SO ORDERED**.

/s/
Robert G. Doumar
Senior United States District Judge
UNITED STATES DISTRICT JUDGE

Norfolk, VA
March 31, 2015

20